UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

CIVIL ACTION NO:
_____

_____
                              )

PAUL BARKER,                         )

                              )           **JURY TRIAL**

                              )           **DEMANDED**

                              )

               Plaintiff      )

                              )

           v.               )

                              )

                              )

NEW HAMPSHIRE CATHOLIC     )

CHARITIES, INC., AND         )

 DAVID TWITCHELL           )

                              )

                 Defendants   )

_____)

## COMPLAINT AND JURY DEMAND

## PARTIES

1.      The plaintiff, Paul Barker ("Mr. Barker" or "Plaintiff"), is a male resident of the Commonwealth of Massachusetts residing at 41 Bowers Avenue, Tyngsboro, MA 01879.

2.      Defendant New Hampshire Catholic Charities, Inc. ("NHCCI") is a New Hampshire non-profit corporation.  NHCCI's principal office is located at 100 William Loeb Drive, Unit 3, Manchester, NH 03109.

3.      David Twitchell ("Mr. Twitchell") is, upon information and belief, NHCCI's current vice president of human resources.  Upon information and belief, Mr. Twitchell is a resident of New Hampshire.  Mr. Twitchell is named in both his individual and official capacities.

## JURISDICTION AND VENUE

4.      This court has subject matter jurisdiction under 28 U.S.C. § 1331 because Mr.

Barker has brought claims pursuant to the Age Discrimination in Employment Act ("ADEA") 29

U.S.C. §§ 621 *et seq.*, the Americans with Disability Act ("ADA") 42 U.S.C. §§ 1201 *et seq.*,

and the Family and Medical Leave Act ("FMLA") 29 U.S.C. §2615.

5.      Venue is appropriate in the District of New Hampshire as the Defendants' acts

and omissions giving rise to the claims in this Complaint occurred in the District of New

Hampshire.  Indeed, Mr. Barker worked for the Defendants and was fired by the Defendants

within the District of New Hampshire.

6.      This court has jurisdiction over NHCCI because NHCCI is a resident of New

Hampshire as it is incorporated in New Hampshire and has its principal place of business in New

Hampshire.  Additionally, NHCCI purposefully availed itself of New Hampshire law by

operating a non-profit corporation in New Hampshire, transacting business in New Hampshire,

and employing employees (including, during the times relevant to this Complaint, Mr. Barker) in

New Hampshire. Indeed, the Plaintiff was employed by NHCCI in the State of New Hampshire,

was managed by NHCCI in the State of New Hampshire, and was terminated by NHCCI in the

State of New Hampshire.  Furthermore, NHCCI is a resident of New Hampshire as they are a

domestic non-profit corporation with their principal office in New Hampshire.

7.      This court has jurisdiction over Mr. Twitchell (in both his individual and official

capacity) because, upon information and belief, he is a resident of New Hampshire.

Additionally, Mr. Twitchell availed himself of New Hampshire law by transacting business

including by managing employees in the State of New Hampshire.  Mr. Twitchell served in a

supervisory capacity over Mr. Barker in New Hampshire, provided directives and managed Mr.

Barker's employment in New Hampshire, and terminated Mr. Barker's employment in the State

of New Hampshire.

## STATEMENT OF FACTS

8.     Mr. Barker was born in September 1955.

9.     Starting on or around July 13, 2007, Mr. Barker began employment for NHCCI as

a warehouse manager based in Manchester, NH performing services related to the New

Hampshire Food Bank (the "Food Bank"), which is run by NHCCI.

10.     At all relevant times, NHCCI employed 20 or more employees for 20 or more

weeks during the calendar year.  Accordingly, at all relevant times, NHCCI was an employer as

defined by federal anti-discrimination laws, including the ADA and the ADEA.

11.     Indeed, at all relevant times, NHCCI employed 50 or more employees during 20

or more calendar weeks during the relevant calendar years.

12.     Accordingly, at all relevant times, NHCCI was a covered employer under the

Family and Medical Leave Act ("FMLA").

13.     At all relevant times, Mr. Barker was a qualified employee, and his job

performance was satisfactory.

14.     In or around March 2017, Mr. Barker was diagnosed with prostate cancer.

15.     Mr. Barker's prostate cancer is an impairment which substantially limits (and, at

all relevant times after March 2017, substantially limited) one or more major life activities,

including, but not limited to, urological functions, bowel functions, and occasional difficulty

with movement (due to pain).  Mr. Barker's prostate cancer is further an impairment which

affects one or more major bodily functions, including his immune system and his body's

production of healthy T-cells.  Accordingly, at all relevant times, Mr. Barker was (and still is) disabled under federal law.

16.     Mr. Barker's prostate cancer is further a serious health condition for which Mr. Barker received continuing care, as defined by the FMLA.

17.     After his diagnosis, Mr. Barker's doctor informed him he needed to undergo invasive surgical treatment for his cancer (after completing the prerequisite tests).

18.     Mr. Barker's surgery was scheduled for July 7, 2017.

19.     Shortly after learning of his cancer diagnosis, Mr. Barker disclosed his cancer diagnosis to his then-direct supervisor, Bruce Wilson ("Mr. Wilson"), the director of operations.

20.     Mr. Barker disclosed his upcoming cancer-related surgery scheduled for July and requested from Mr. Wilson the disability-related reasonable accommodation of approximately two months of leave starting on or around July 7, 2017, in order to undergo surgical treatment and recovery related to his prostate cancer.

21.     At all relevant times, NHCCI employed 50 or more employees within a 75-mile radius of Mr. Barker's worksite in Manchester, New Hampshire.

22.     Furthermore, at all relevant times, Mr. Barker had been an employee for at least 12 months and had worked in excess of 1250 hours during the preceding 12-month period. As such, Mr. Barker was an eligible employee for leave protected under the FMLA.

23.     As such, this reasonable accommodation request for disability-related leave further constituted a request for protected FMLA leave.

24.     Mr. Wilson approved this request.

25.     Mr. Barker's cancer disability and upcoming disability-related FMLA leave were also disclosed to the newly-hired Executive Director of Operations (and Mr. Wilson's supervisor) Eileen Liponis ("Ms. Liponis").

26.     Ms. Liponis is a non-disabled woman who, upon information and belief, is more than ten years younger than Mr. Barker.

27.     On or around July 7, 2017, Mr. Barker began his protected FMLA leave and underwent surgery to treat his prostate cancer.

28.     In or around the second week of September 2017, Mr. Barker returned from his FMLA leave.

29.      After Mr. Barker returned from his leave, he (Mr. Barker) requested from Mr. Wilson the reasonable accommodation of intermittent leave for his disability, as his cancer treatment required regular medical appointments, including testing which left Mr. Barker fatigued.

30.     Mr. Wilson granted this accommodation request.

31.     In or around September 2019, Mr. Barker was given the position of Food Sourcing Manager.  This position came with a raise and an increase in responsibilities.

32.     In or around October 2019, Mr. Wilson retired from his position.

33.     Around this time, Ms. Liponis began to treat Mr. Barker in a negative and seemingly discriminatory manner. For instance, Mr. Liponis would assign projects to Mr. Barker's direct subordinates without telling Mr. Barker.

34.     Furthermore, Ms. Liponis would not give Mr. Barker pertinent information as to the nature of the work she assigned his subordinates, which threatened to cause a rift between Mr. Barker's work team and him.

35.     Ms. Liponis did not treat other younger and/or non-disabled managers in this manner.

36.     Dennis Gichana ("Mr. Gichana") then became Mr. Barker's direct supervisor, with Ms. Liponis overseeing operations and serving as the direct supervisor of Mr. Gichana and second level supervisor above Mr. Barker.

37.     Mr. Gichana is a non-disabled man who is more than ten years younger than Mr. Barker.

38.     In or around March 2020, due to the outbreak of the coronavirus pandemic, Mr. Barker requested from Mr. Gichana the reasonable accommodation of working from home due to his cancer disability, which had severely compromised his immune system.

39.     Because Mr. Barker could perform all essential functions of his job remotely, this was not an undue burden on NHCCI.

40.     Notably, the vast majority (if not all) NHCCI management employees at Mr. Barker's level or higher were also permitted to work from home.

41.     Mr. Gichana granted this reasonable accommodation and Mr. Barker thus commenced working from home as he had been given permission to do.

42.     In or around the fourth week of March 2020, while Mr. Barker was working from home, Mr. Gichana solicited Mr. Barker's input on a business transaction he was working on, as Mr. Barker had some familiarity in the territory.  Mr. Barker's tone was neutral, and Mr. Gichana seemed appreciative of his input, which was given by phone.

43.     Afterwards, Ms. Liponis (who was not on the call but in a nearby office listening to the conversation, which Mr. Gichana had on speaker phone) admonished Mr. Barker for

allegedly being rude and offering unsolicited input. This was clearly in retaliation for Mr. Barker requesting and utilizing his accommodation of working from home.

44.     Additionally, believing this to be part of a pattern of conduct that targeted him with more negative treatment than the treatment of younger, non-disabled employees, Mr. Barker raised protected concerns to Ms. Liponis about how he felt she was discriminatorily targeting him. Due to verbal comments she had made, Mr. Barker believed her disparate targeting was in part due to his age.

45.     In or around April 2020, Mr. Barker requested from Mr. Gichana the reasonable accommodation of continuing to work from home, on account of his disability qualifying him as a high-risk individual due to the coronavirus (as his cancer and cancer related treatment left his immune system weakened).

46.     Because Mr. Barker could perform (and indeed, had been performing) all essential functions of his job remotely, this was not an undue burden on NHCCI.

47.     Mr. Gichana granted his reasonable accommodation request, but he cryptically told Mr. Barker he could continue working from home until the pandemic was over or when Mr. Barker retired.

48.     This comment was alarming because Mr. Barker had never told Mr. Gichana that he had any plans to retire in the near future and indeed he (Mr. Barker) intended to work for as long as he was able.

49.     From this conversation, it became clear that Mr. Gichana and/or NHCCI was hoping and/or pushing Mr. Barker to retire sooner rather than later due to his age or status as an older individual with a life-threatening disability.

50.     In or around May 2020, Ms. Liponis continued to circumvent Mr. Barker's involvement in the workplace by assigning tasks to Mr. Barker's direct subordinates without his knowledge.

51.     For instance, one of Mr. Barker's subordinates, Ann Cote ("Ms. Cote"), received assignments from Ms. Liponis without his knowledge.

52.     Due to Mr. Barker's exclusion from these assignments by Ms. Liponis, it is clear his role was being purposefully and discriminatorily diminished at NHCCI.

53.     Additionally, Mr. Barker began developing symptoms of generalized anxiety disorder and was diagnosed with this by his doctor.

54.     Mr. Barker's generalized anxiety disorder is an impairment which substantially limits one or more major life activities, including, but not limited to, sleeping, thinking, and processing emotions. Mr. Barker's generalized anxiety disorder is further an impairment which affects one or more major bodily functions, including his neurological and emotional functions. Accordingly, at all relevant times, Mr. Barker was (and still is) further disabled under federal law.

55.     Additionally, the medication Mr. Barker received for his anxiety disorder temporarily impacted his ability to drive.

56.     Mr. Barker disclosed his anxiety disability to NHCCI.

57.     On or around July 6, 2020, Mr. Gichana communicated that all employees had to be back and working in the office by July 24, 2020, unless a reason was provided.

58.     Mr. Barker spoke to Mr. Gichana and disclosed that his doctor did not believe it was safe for Mr. Barker to return due to his cancer disability.

59.     Mr. Barker therefore requested the reasonable accommodation of continuing to work from home for a time, which was not an undue burden on NHCCI as he was able to, and in fact had been doing, all the essential functions of his position remotely.

60.     Mr. Gichana granted this reasonable accommodation request, but he told Mr. Barker to send a doctor's note to corroborate his accommodation request.  Mr. Barker said he would do so but noted that it sometimes took weeks to schedule and attend doctor's appointments for non-emergency issues.  Mr. Gichana indicated that there was no specific deadline for submitting the note.

61.     Because doctor's visits were staggered during the pandemic, Mr. Barker had to schedule an appointment.

62.     On or around July 31, 2020, Mr. Barker sent Mr. Gichana a copy of a note signed by his doctor.  Among other things, the doctor's note stated: "It is my professional opinion that this patient is high risk for Covid-19 and it [is] medically indicated for him to continue to work form [sic] home."

63.     In or around the second week of August 2020, Mr. Gichana contacted Mr. Barker and told him that David Twitchell ("Mr. Twitchell"), the vice president of human resources, was rejecting the doctor's note as an allegedly inadequate reason to work from home and accordingly was denying Mr. Barker's request to work from home as a disability accommodation.

64.     Mr. Twitchell is a non-disabled man who is younger than Mr. Barker.

65.     Mr. Twitchell denied Mr. Barker's requested accommodation without engaging in any interactive dialogue with him and without asking him to clarify anything related to the doctor's note he had already submitted.

66.     Mr. Barker then contacted Mr. Twitchell to reiterate that he was requesting this accommodation because of his disabilities.  Mr. Barker further explained how his doctor believed it would be unsafe for him to resume his duties in an office and in the field (as opposed to working remotely) due to Mr. Barker's disabilities.

67.     Indeed, Mr. Barker further elaborated to Mr. Twitchell that he was suffering from a diagnosed anxiety condition, including being prescribed anti-anxiety medication, which temporarily impacted his ability to drive.

68.     Mr. Barker reiterated his request to be allowed to continue working from home on a temporary basis as an accommodation for his disabilities.

69.     Mr. Twitchell did not engage in any interactive dialogue with Mr. Barker about this request.

70.     Instead, Mr. Twitchell sent Mr. Barker an email again denying Mr. Barker's requested disability-related accommodation.  Indeed, not only did Mr. Twitchell deny Mr. Barker's accommodation request, but he copied Mr. Gichana, Ms. Liponis, and the chief operations officer, Dominique Rust ("Ms. Rust"), to the email thread, which included the chain of emails where Mr. Barker had privately disclosed his anxiety disorder and requested disability-related accommodations.

71.     Ms. Rust is a non-disabled woman more than ten years younger than Mr. Barker.

72.     Mr. Twitchell thus disclosed, without Mr. Barker's permission, Mr. Barker's anxiety-related disability to Mr. Gichana, Ms. Liponis, and Ms. Rust.

73.     Notably, NHCCI refused to engage in a meaningful interactive dialogue regarding reasonable accommodations for Mr. Barker's disabilities.  Thus, NHCCI (as well as Mr.

Twitchell specifically) failed to explore whether there were other less burdensome alternative accommodations that could have been provided.

74.     Following Mr. Twitchell's email, Mr. Gichana contacted Mr. Barker and told him to call Ms. Liponis.

75.     Mr. Barker called Ms. Liponis, who was waiting with Mr. Gichana on the phone line with her.  Ms. Liponis instructed Mr. Barker to return to the office by October 1, 2020. Ms. Liponis informed Mr. Barker he would have to also immediately start traveling by car for extended periods, including making store to store routes.  This requirement was obviously beyond the essential functions of Mr. Barker's position, as he had successfully performed the essential functions of his position for many months without traveling store to store routes.

76.     Mr. Barker raised protected concerns that this requirement would be harmful to his health due to his disabilities and raised concerns that NHCCI was improperly refusing to grant reasonable accommodations that didn't pose an undue hardship without even engaging in an interactive dialogue about this or other alternative accommodations (such as simply returning to the office without having to go store to store). Mr. Barker further mentioned that store to store functions could be successfully performed remotely without in person travel, as they had been during the course of the ongoing pandemic.  As such, Mr. Barker again asked for the reasonable accommodation of being permitted to continue to work remotely.

77.     Indeed, upon information and belief, other NHCCI employees worked from home as did other employees holding the same position as Mr. Barker at other affiliated food banks.

78.     Despite this, Ms. Liponis refused to engage in an interactive dialogue with Mr. Barker.

79.     Because of NHCCI's refusal to engage in an interactive dialogue, on or around August 19, 2020, Mr. Barker requested FMLA paperwork from Mr. Twitchell.  Mr. Barker informed Mr. Twitchell he intended to file for his eligible 12 weeks of FMLA leave due to his disabilities.

80.     Notably, this was not Mr. Barker's preferred accommodation, but was only requested because of NHCCI's refusal to grant Mr. Barker's reasonable accommodation of continuing to work remotely and/or to engage in an interactive dialogue regarding accommodations that would enable Mr. Barker to safely work.

81.     On or around September 3, 2020, Mr. Barker's doctor filled out and turned in FMLA paperwork to NHCCI on behalf of Mr. Barker.

82.     On or around September 10, 2020, Mr. Twitchell notified Mr. Barker that NHCCI was denying his request for FMLA leave because NHCCI contended that his FMLA paperwork did not cite a qualified reason for leave.  This assertion was inaccurate and the FMLA leave should have granted.

83.     Indeed, the paperwork specifically noted that Mr. Barker was seen for "oncology" and "urology" and that he suffered a condition that caused "pain," "frequent urination," and put him at a "very high risk of contracting Covid-19."

84.     Mr. Barker then sent Mr. Twitchell a second doctor's note dated September 10, 2020 stating: "Paul should not be operating a motor vehicle while he is on his current anxiety medicine.  This medicine is taken daily due to his medical condition and impairs his ability to operate a motor vehicle safely.   Please allow Paul to work from home as he cannot complete his job duties outside of his home due to being high risk for Covid-19 and the impairments due to medication listed above."

85.     Further, Mr. Barker was still willing to discuss returning to the office if he could do so in a safe manner and if, for a temporary period, he would not be required to make the store to store visits.

86.     Notably, the driving restriction was temporary, which was something Mr. Barker clearly conveyed to NHCCI.

87.     Mr. Twitchell then contacted Mr. Barker that same day and told Mr. Barker that NHCCI was putting him on FMLA leave effective immediately.

88.     As such, Mr. Twitchell refused to engage in an interactive dialogue related to Mr. Barker's request for a reasonable accommodation that would allow him to work while minimizing risks associated with his disability.  Instead, Defendants put Mr. Barker out on FMLA leave.

89.     This leave was unpaid and as a result Mr. Barker was forced to use his sick time and vacation time during this period.  Accordingly, by forcing him on FMLA leave rather than engaging in an interactive dialogue with Mr. Barker, Defendants forced Mr. Barker on an unpaid suspension.

90.     Mr. Barker thus went out on this unpaid suspension/FMLA leave on or around September 10, 2020.  Mr. Barker's FMLA leave was to expire on or around December 3, 2020.

91.     On or around October 3, 2020, Mr. Barker raised protected concerns to Mr. Twitchell that he felt he was being pushed out of the door at NHCCI due to his age.  Indeed, he specifically stated by email: "I feel like I am being pushed out the door because of my age."

92.     Mr. Barker further made it clear he was concerned regarding NHCCI's lack of willingness to discuss accommodations related to his disabilities.  Mr. Barker raised additional protected concerns that he had been previously told he would be allowed to continue working

from home as an accommodation during the pandemic, and this accommodation was now being cut short or otherwise revoked.

93.     On or around October 13, 2020, Mr. Twitchell responded to Mr. Barker's expressions of concerns by stating NHCCI would hold Mr. Barker's position open for him until December 4, 2020, but that if Mr. Barker did not return after his FMLA leave with *no restrictions*, then NHCCI would immediately terminate Mr. Barker.  This statement of unwillingness to allow any additional disability-based leave or any accommodations after the end of Mr. Barker's disability-related FMLA leave constituted a per se violation of relevant disability laws.

94.     Notably, Mr. Twitchell did not engage in an interactive dialogue regarding Mr. Barker's reasonable accommodation request to resume working from home or to be allowed to work from the NHCCI facility without driving store to store.

95.     Mr. Twitchell additionally failed to address the protected concerns about the discriminatory and other improper treatment that Mr. Barker had raised, including concerns over Defendants' refusal to accommodate his disabilities and about attempts to push him out or otherwise pressure him to retire due to his age.

96.     On or around October 14, 2020, Mr. Barker informed Mr. Twitchell he would apply for short-term disability benefits to cover a portion of his income while he was out on leave.  Mr. Barker fully intended to return to work at NHCCI as soon as he was able and did not indicate in any way that he did not intend to return.

97.     On or around November 23, 2020, after Mr. Barker's short-term disability application was denied.  Mr. Twitchell contacted Mr. Barker and told him that if he did not return by December 4, 2020 he would be terminated.

98.     Mr. Barker raised concerns that affiliated food banks suspended in-store visits by employees (and continued that suspension of in-store visits through that time) in an effort to safeguard employees' health.  Indeed, these other food banks affiliated with NHCCI were allowing even non-disabled employees to avoid travel, as this was not an essential function for employees similarly situated to Mr. Barker.  It was therefore disparate treatment by Ms. Liponis and/or NHCCI to insist he return to perform these functions that his younger and non-disabled colleagues were not required to do.

99.     Mr. Twitchell again ignored Mr. Barker's raised protected concerns.

100.    Mr. Barker was involuntarily terminated on December 4, 2020.

101.    On April 1, 2021, Mr. Barker timely filed a Charge of Discrimination with the New Hampshire Commission for Human Rights ("NHCHR") and cross-filed this charge with the United States Equal Employment Opportunity Commission ("EEOC").

102.    On September 27, 2021, Mr. Barker notified the NHCHR of his intent to pursue this matter in Federal Court.

103.    On October 18, 2021, the EEOC issued Mr. Barker a Right to Sue letter.

104.    This lawsuit is timely filed.

**COUNT I**

**(Interference with, and Retaliation for Exercising, Rights under the Family and Medical Leave Act – 29 U.S.C. §2615)**

**Plaintiff v.  All Defendants (NHCCI and Mr. Twitchell)**

105.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

106.    During all relevant times, NHCCI was engaged in an industry affecting commerce and employed 50 or more employees for 20 or more calendar work weeks in each current and/or preceding calendar year.

107.    As such, at all relevant times, NHCCI was a covered employer under the FMLA.

108.    At all relevant times, NHCCI employed 50 or more employees within 75 miles of Mr. Barker's worksite.

109.    At all relevant times (from July 2007 onward), Mr. Barker had worked for NHCCI for 12 or more months and had worked in excess of 1,250 hours within the past 12-month period.

110.    As such, from July 2007 onward, Mr. Barker was an eligible employee under the FMLA.

111.    Mr. Barker suffered from one or more serious health conditions, including, but not limited to, his cancer and his generalized anxiety disorder.  Mr. Barker received continuing care for these serious health conditions.

112.    Mr. Barker was entitled to FMLA leave.

113.    Mr. Barker sought to exercise his rights under the FMLA, including by requesting and utilizing one or more protected leaves under the FMLA.

146.    Mr. Barker timely notified Defendants that he would need FMLA leave and properly completed, and timely turned in, all requested paperwork related to this leave request.

147.    The Defendants, including by and through its agents, interfered with Mr. Barker's rights under the FMLA leave, including but not limited to, by denying him FMLA leave when he initially requested it (thereby preventing him from commencing leave for a period of time) and by refusing to restore him to the same or similar position.

148.     The Defendants, including by and through their agents, retaliated and/or discriminated against Mr. Barker for requesting FMLA leave by subjecting Mr. Barker to a harassing and otherwise hostile work environment, diminishing his role with NHCCI, undermining his authority with his subordinates, denying him legitimately requested disability related accommodations, subjecting Mr. Barker to an unpaid suspension (by forcing him to involuntarily utilize FMLA), forcing Mr. Barker to utilize sick-time and vacation against his will during an involuntary leave, and/or terminating Mr. Barker's employment.

149.     Mr. Twitchell was an employer under the FMLA because he had the power to hire and/or fire Mr. Barker, supervised and controlled Mr. Barker's conditions of employment, including his work schedule, played a role in determining Mr. Barker's rate and method of payment, and/or played a role in maintaining Mr. Barker's employment records

150.     The Defendants' actions were willful violations of the FMLA and were undertaken in bad faith.

151.     As a direct and proximate result of the Defendants' violation of the FMLA, Mr. Barker has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

152.     Mr. Barker seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, liquidated (i.e. double) damages, interest, attorneys' fees, and costs.

**COUNT II**

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with**

**Disabilities Act, 42 U.S.C. §§12101, et seq.)**

**Plaintiff v. NHCCI**

114.    The Plaintiff incorporates all paragraphs above and below as if set forth fully

herein.

115.    Mr. Barker's prostate cancer is an impairment which substantially limits (and, at

all relevant times after March 2017, substantially limited) one or more major life activities,

including, but not limited to, urological functions, bowel functions, and occasional difficulty

with movement (due to pain).  Mr. Barker's prostate cancer is further an impairment which

affects one or more major bodily functions, including his immune system and his body's

production of healthy T-cells.  Accordingly, at all relevant times, Mr. Barker was (and still is)

disabled under the Americans with Disabilities Act (hereinafter the "ADA").

116.    Mr. Barker's generalized anxiety disorder is an impairment which substantially

limits one or more major life activities, including, but not limited to, sleeping, thinking, and

processing emotions.  Mr. Barker's generalized anxiety disorder is further an impairment which

affects one or more major bodily functions, including his neurological functions.  Accordingly, at

all relevant times, Mr. Barker was (and still is) further disabled under the ADA.

117.    At all relevant times, NHCCI was an employer as defined by federal anti-

discrimination laws, including the ADA, employing 15 or more employees for each working day

in each of 20 or more calendar weeks in the current or preceding calendar year.

118.    At all relevant times, Mr. Barker was a qualified individual and was capable of

performing the essential functions of his job with or without one or more reasonable

accommodations.

119.    Mr. Barker disclosed his disabilities to NHCCI, NHCCI was aware of Mr. Barker's disabilities, and/or NHCCI regarded Mr. Barker as disabled.

120.    Mr. Barker requested disability-related reasonable accommodations that would have assisted him in performing the essential functions of his job. These requested reasonable accommodations included, but were not limited to, working remotely, being allowed to perform the essential functions of his position without being required to perform non-essential store to store visits, and/or being allowed to utilize disability-related leave.

121.    NHCCI denied some or all of the reasonable accommodations requested by Mr. Barker, including his request to working remotely, being allowed to perform the essential functions of his position without being required to perform non-essential store to store visits, and/or being allowed to utilize disability-related leave.

122.    NHCCI and its agents failed to engage in an interactive dialogue related to some or all of Mr. Barker's reasonable accommodation requests.  Indeed, NHCCI's declaration that Mr. Barker could only return "without restrictions" was a per se violation of the ADA because it constituted a denial not just of the requested accommodations, but also of all other less burdensome accommodations that would have been possible.

123.    Mr. Barker's requested disability-related accommodations did not pose an undue burden on NHCCI.

124.    NHCCI, by and through their agents, discriminated against Mr. Barker due to his disabilities by subjecting Mr. Barker to adverse actions, including, but not limited to, by subjecting Mr. Barker to a harassing and otherwise hostile work environment, diminishing his role with NHCCI, undermining his authority with his subordinates, denying him legitimately requested disability related accommodations, subjecting Mr. Barker to an unpaid suspension (by

forcing him to involuntarily utilize FMLA), forcing Mr. Barker to utilize sick-time and vacation time against his will during an involuntary leave, and/or terminating Mr. Barker's employment.

125. NHCCI acted with malice and/or with reckless indifference to the federally protected rights of Mr. Barker.

126. As a direct and proximate result of NHCCI's violation of the ADA, Mr. Barker has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

127. The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT III

### (Age Discrimination in Violation of the Age Discrimination in Employment Act)
### Plaintiff v. NHCCI

128. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

129. During all relevant times, NHCCI was an employer under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq. (hereinafter, "ADEA") because NHCCI employed 20 or more individuals for 20 or more calendar weeks during the relevant calendar years.

130. NHCCI, by and through its agents, harassed and discriminated against Mr. Barker with respect to his compensation, terms, conditions, and/or privileges of employment, because of

Mr. Barker's age and/or because Mr. Barker was an older disabled individual ("age plus" discrimination).

131.    More specifically, NHCCI subjected Mr. Barker to adverse actions because of his age, including, but not limited to, by subjecting Mr. Barker to a harassing and otherwise hostile work environment, diminishing his role with NHCCI, undermining his authority with his subordinates, denying him legitimately requested disability related accommodations, subjecting Mr. Barker to an unpaid suspension (by forcing him to involuntarily utilize FMLA), forcing Mr. Barker to utilize sick-time and vacation time against his will during an involuntary leave, and/or terminating Mr. Barker's employment.

132.    NHCCI acted with willful and/or knowing indifference to the federally protected rights of Mr. Barker.

133.    As a direct and proximate result of NHCCI's violations of the ADEA, Mr. Barker has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, interest on lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

134.    Mr. Barker seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), liquidated (i.e. double) damages, interest, attorneys' fees, and costs.

**COUNT IV**

**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**
**Plaintiff v. NHCCI**

135.     The Plaintiff incorporates all paragraphs above and below as if set forth fully

herein.

136.     Mr. Barker engaged in protected activity under the ADA, including, but not

limited to, (i) by requesting and/or utilizing disability-related accommodations; (ii) by raising

protected concerns related to disability-related harassment and discrimination; and/or (iii) by

raising protected concerns related to the improper failure of NHCCI to grant disability-related

accommodations and to engage in an interactive dialogue about requested disability-related

accommodations, as well as potential alternative accommodations.

137.     NHCCI discriminated against and/or retaliated against Mr. Barker for engaging in

activities protected under the ADA, including but not limited to, by subjecting Mr. Barker to a

harassing and otherwise hostile work environment, diminishing his role with NHCCI,

undermining his authority with his subordinates, denying him legitimately requested disability

related accommodations, subjecting Mr. Barker to an unpaid suspension (by forcing him to

involuntarily utilize FMLA), forcing Mr. Barker to utilize sick-time and vacation time against his

will during an involuntary leave, and/or terminating Mr. Barker's employment.

138.     NHCCI unlawfully coerced, intimidated, threatened, and/or interfered with Mr.

Barker's exercising of, or enjoyment of, one or more rights granted by the ADA.

139.     NHCCI acted with malice and/or with reckless indifference to the federally

protected rights of Mr. Barker.

140.     As a direct and proximate result of NHCCI's violation of the ADA, Mr. Barker

has suffered and continues to suffer damages, including, but not limited to, lost compensation

and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

141.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT V

### (Retaliation in Violation of the Age Discrimination in Employment Act)
### Plaintiff v. NHCCI

142.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

143.    Mr. Barker engaged in protected activity under the ADEA, including, but not limited to: (i) opposing, expressing protected concerns, and/or engaging in other protected activity regarding a hostile work environment based on age and/or (ii) opposing, expressing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by NHCCI due to Mr. Barker's age, including raising protected concerns about being subjected to disparate treatment due to his age that was worse than, and inconsistent with, the treatment of younger employees and being subjected to a harassing and otherwise hostile work environment.

144.    NHCCI retaliated against Mr. Barker for opposing, expressing protected concerns, and/or engaging in other protected activity related to one or more practices made unlawful by the ADEA, including but not limited to, by subjecting Mr. Barker to a harassing and otherwise hostile work environment, diminishing his role with NHCCI, undermining his authority with his

subordinates, denying him legitimately requested disability related accommodations, subjecting

Mr. Barker to an unpaid suspension (by forcing him to involuntarily utilize FMLA), forcing Mr.

Barker to utilize sick-time and vacation time against his will during an involuntary leave, and/or

terminating Mr. Barker's employment.

145.    NHCCI unlawfully coerced, intimidated, threatened, and/or interfered with Mr.

Barker's exercising of, or enjoyment of, one or more rights granted by the ADEA.

146.    NHCCI willfully violated the ADEA because NHCCI knew or should have

known its conduct was prohibited by Federal law and/or NHCCI acted with malice and/or with

reckless indifference to the federally protected rights of Mr. Barker.

147.    As a direct and proximate result of NHCCI's violations of the ADEA, Mr. Barker

has suffered and continues to suffer damages, including, but not limited to, lost compensation

and benefits, interest on lost compensation and benefits, loss of earning capacity, pain and

suffering, loss of enjoyment of life, and emotional damages.

148.    Mr. Barker seeks all damages to which he is entitled, including, but not limited to,

lost compensation and benefits (including, but not limited to, back pay and front pay),

diminished earning capacity, injury to reputation, other monetary damages, compensatory

damages (including, but not limited to, future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses),

liquidated damages, attorneys' fees, interest, and costs.

WHEREFORE, the plaintiff, Paul Barker, respectfully prays that this honorable

court:

A.  Schedule this matter for trial by jury;

B.  Find the Defendants liable on all counts;

C.  Award the Plaintiff his lost compensation and benefits (including, but not limited to, back pay and front pay);

D.  Award the Plaintiff other monetary damages, including damages for his diminished earning capacity and injury to reputation;

E.  Award the Plaintiff damages for his emotional pain, mental anguish, loss of enjoyment of life, suffering, and other emotional distress damages;

F.  Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

G.  Award the Plaintiff liquidated damages;

H.  Award the Plaintiff punitive damages;

I.  Award the Plaintiff his reasonable attorney's fees;

J.  Award the Plaintiff interest and costs;

K.  Award the Plaintiff all other damages to which he is entitled; and

L.  Grant such further relief as is just and equitable.

Respectfully Submitted,

Paul Barker

By his attorneys,

THE LAW OFFICES OF WYATT
& ASSOCIATES P.L.L.C

Date:  10/20/21                    By:  __*/s/Timothy J. Brock*_____

Benjamin J. Wyatt, NH BAR # 20530
BWyatt@Wyattlegalservices.com

Timothy J. Brock NH BAR #268403
TBrock@Wyattlegalservices.com

The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1111
Facsimile: (603) 685-2868